ELISE R. SANGUINETTI, SBN 191389
MATTHEW J. KITA, SBN 321652
**ARIAS SANGUINETTI WANG & TEAM LLP**
2033 N. Main Street, Suite 1000
Walnut Creek, California 94596
Telephone: (510) 629-4877
Facsimile: (510) 291-9742
Elise@aswtlawyers.com
Matthew@aswtlawyers.com
Ncservice@aswtlawyers.com

Attorneys for Plaintiffs
SARA GRANDA AND JOSE GRANDA

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA – SACRAMENTO DIVISION

| | |
|---|---|
| SARA GRANDA, an individual, JOSE GRANDA, an individual,<br><br>Plaintiffs,<br><br>vs.<br><br>CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM and DOES 1 - 10, inclusive,<br><br>Defendants. | CASE NO. 2:21-CV-01256-DAD-CSK<br><br>*Hon. Dale A. Drozd*<br><br>**PLAINTIFFS' OPPOSITION TO CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM'S MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date: August 4, 2025<br>Time: 1:30 p.m.<br>Location: Zoom<br><br>Complaint Filed: July 16, 2021<br>Trial Date:        None |

**TABLE OF CONTENTS**

UNITED STATES DISTRICT COURT....................................................................................i

TABLE OF CONTENTS.........................................................................................................i

TABLE OF AUTHORITIES ..................................................................................................ii

ADDITIONAL FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION......................................1

ARGUMENT & AUTHORITIES.............................................................................................7

    A.    TITLE II APPLIES TO PLAINTIFFS' CLAIMS. ......................................................7

    B.    THE ADA'S "SAFE-HARBOR PROVISION" DOES *NOT* APPLY TO PLAINTIFFS' CLAIMS. ..........................................................................................11

    C.    PLAINTIFFS' CLAIMS FOR MONETARY DAMAGES AGAINST CALPERS ARE NOT BARRED BY THE ELEVENTH AMENDMENT.............14

        1.    THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER CALPERS VIOLATED TITLE II...........................................15

        2.    PLAINTIFFS HAVE ALLEGED VALID FOURTEENTH AMENDMENT VIOLATIONS AGAINST CALPERS. ...........................15

            A.    ELEMENTS ONE AND TWO: ADDRESSING THE EVIL...........17

            B.    ELEMENT THREE: PROPORTIONALITY .................................19

        3.    CALPERS'S AUTHORITIES SUGGESTING AN OPPOSITE RESULT ARE NOT PERSUASIVE. .........................................................20

    D.    BECAUSE SUMMARY JUDGMENT IS INAPPROPRIATE ON SARA'S CLAIMS UNDER TITLE II, CALPERS IS NOT ENTITLED TO SUMMARY JUDGMENT ON JOSE'S CLAIMS EITHER.................................21

CONCLUSION ....................................................................................................................21

**PLAINTIFFS' OPPOSITION TO CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF AUTHORITIES

## CASES

*Ahmed v. Regents of Univ. of California*,
  No. 3:17-cv-00709, 2018 WL 747796 (S.D. Cal. Feb. 7, 2018)...............................................9

*Alexander v. Choate,*
  469 U.S. 287 (1985)..............................................................................................................18

*Allford v. Barton*,
  No. 1:14-cv-00024, 2015 WL 2455138 (E.D. Cal. May 22, 2015) .........................................9

*Board of Trustees of University of Alabama v. Garrett*,
  531 U.S. 356 (2001)..............................................................................................................16

*City of Boerne v. Flores*,
  521 U.S. 507 (1997)........................................................................................................17, 19

*Cleburne v. Cleburne Living Center, Inc.*,
  473 U.S. 432 (1985)..............................................................................................................19

*Currie v. Group Ins. Comm'n*,
  290 F.3d 1 (1st Cir. 2002) ...............................................................................................9, 13

*Currie v. Group Ins. Comm'n*,
  147 F. Supp. 2d 30 (D. Mass. 2001) ......................................................................8, 9, 10, 13

*Florida Prepaid Postsecondary Educ. Expense Bd. v. College Savings Bank*,
  527 U.S. 627 (1999)..............................................................................................................17

*Granda v. California Pub. Employees' Ret. Sys.*,
  620 F. Supp. 3d 1038 (E.D. Cal. 2022).......................................................................7, 8, 9, 11

*Kitchen v. Lodi Unified Sch. Dist.*,
  No. 2:14-cv-01436, 2014 WL 5817320 (E.D. Cal. Nov. 5, 2014)......................................9, 10

*Kohn v. State Bar of Cal.*,
  119 F.4th 693 (9th Cir. 2024).......................................................................................14, 15, 16

*Lewis v. New Mexico Dep't of Health*,
  94 F. Supp. 2d 1217 (D.N.M. 2000) ............................................................................17, 18, 20

*Lovell v. Chandler*,
  303 F.3d 1039 (9th Cir. 2002)...............................................................................................15

*McLean v. State of Cal.*,
  377 P.3d 796 (Cal. 2016) ........................................................................................................8

*Musgrove v. Board of Regents of the University System of Georgia*,
  No. 3:18-cv-80, 2014 WL 13301434 (M.D. Ga. Feb. 14, 2019) .....................................20, 21

*Olmstead v. L.C. ex rel. Zimring*,
  527 U.S. 581 (1999).........................................................................................................10, 15

*PGA Tour, Inc. v. Martin*,
  532 U.S. 661 (2001)................................................................................................................9

-ii-

**PLAINTIFFS' OPPOSITION TO CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM'S MOTION FOR SUMMARY JUDGMENT**

*Ritcher v. Ausmus*,
No. 3:19-cv-1800, 2021 WL 580055 (N.D. Cal., Feb. 16, 2021) ........................................ 10

*Rogers v. Dept. of Health & Envt'l Ctrl.*,
174 F.3d 431 (4th Cir. 1999) ................................................................................ 12

*Rouse v. Berry*,
848 F. Supp. 2d 4 (D.D.C. 2012) ........................................................................... 13

*Stein v. Kaiser Found. Health Plan, Inc.*,
115 F.4th 1244 (9th Cir. 2024) .............................................................................. 12

*United States v. Georgia*,
546 U.S. 151 (2006) ........................................................................................... 16

*United States v. Wilson*,
503 U.S. 329 (1992) ........................................................................................... 11

*Walker v. Sumner*,
917 F.2d 382 (9th Cir. 1990) ................................................................................ 13

*Weyer v. Twentieth Century Fox Film Corp.*,
198 F.3d 1104 (9th Cir. 2000) .......................................................................... 10, 12

*Zimmerman v. Oregon Department of Justice*
170 F.3d 1169 (9th Cir. 1999) ......................................................................... 7, 8, 9

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. XI .................................................................................................. 14, 15

U.S. CONST. AMEND. XIV .......................................................................................... 14, 15, 16

## STATUTES

42 U.S.C. § 12101 ........................................................................................................ 18

42 U.S.C. § 12111 ........................................................................................................ 10

42 U.S.C. § 12112 ........................................................................................................ 10

42 U.S.C. § 12131 ........................................................................................................ 19

42 U.S.C. § 12132 .......................................................................................................... 7

42 U.S.C. § 12201 ........................................................................................................ 13

## RULES

Fed. R. Civ. P. 56 ......................................................................................................... 13

## REGULATIONS

28 C.F.R. § 35.130 ....................................................................................................... 19

-iii-
**PLAINTIFFS' OPPOSITION TO CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM'S
MOTION FOR SUMMARY JUDGMENT**

**LEGISLATIVE HISTORY**

H.R. Rep. 101–485(II) (1989),
  *reprinted in* 1990 U.S.C.C.A.N. 903................................................................................. 18

H.R. Rep. 101–485(III) (1989),
  *reprinted in* 1990 U.S.C.C.A.N. 445................................................................................. 18

**PLAINTIFFS' OPPOSITION TO CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM'S
MOTION FOR SUMMARY JUDGMENT**

## ADDITIONAL FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION

### The Plaintiffs

Sara Granda is a 45-year old woman living in Davis, California who was rendered quadriplegic as a result of an automobile accident in 1997, when she was 17. (SAF 1.) Sara is ventilator and wheelchair dependent and needs 24-hour skilled nursing assistance, rather than non-licensed caregiving or attendant care in order to reside at home. (SAF 2.) Given her permanent disability, Sara is perpetually at high serious risk of life-threatening medical complications if the appropriate skilled nursing care is not provided. (SAF 3.) Sara's home is an appropriate place for her to receive skilled nursing care, and Sara wishes to remain at home. (SAF 4.)

Jose Granda, Sara's father, is a professor at California State University, Sacramento, and as such, is enrolled as an employee in the CalPERS system and receives health care coverage through CalPERS for himself and his family. (SAF 5.)

### Relevant Agreements

Sara's CalPERS plan did not provide sufficiently for Sara's need for in-home skilled nursing services. (SAF 6.) As such, in 1998, Sara, Jose, and Sara's mother entered an agreement with CalPERS (the "1998 Agreement") providing for skilled nursing care to be administered at Sara's home. (SAF 7.) Under the 1998 Agreement, CalPERS facilitated the provision of skilled nursing care in Sara's home by converting dollars available for a covered benefit (skilled nursing care) under its policy for at-home skilled nursing care. (SAF 8.) In pertinent part, the 1998 Agreement provides:

— As an "in lieu of" benefit", the "equivalent of 12 hours per day, 12 months per year, of skilled (LVN) nursing services from CalPERS, and 12 hours per day, 12 months per year, of skilled (LVN) nursing services from Medi-Cal." (SAF 9.)

— An agreement that the parties to the 1998 Agreement would "meet at least annually to review the terms of the agreement in light of any changed circumstances and renegotiate if needed." (SAF 10.)

— Action Home Nursing Services, a home health care agency, was a party to the 1998 Agreement. Action Home Nursing provided for the staffing of qualified LVNs to provide 24-hour home care. (SAF 12.) Action Home Nursing was also responsible for

-1-

providing training and reimbursing providers for these skilled nursing services. (SAF 12.) In exchange, Action Home Nursing agreed to accept CalPERS reimbursement rate of $34/hour for 12 hours per day, and to accept that Medi-Cal would provide reimbursement at its rate for the remaining 12 hours per day. (SAF 13.)

In 2012, Ann Boynton, Deputy Executive Officer of CalPERS, sent Sara a letter that memorialized and confirmed that CalPERS agreed to amend the 1998 Agreement to add RN services and increase the CalPERS reimbursement rate for skilled nursing up to $45/hour for LVNs and $56/hour for RNs (the "Boynton Letter"). (SAF 14.) CalPERS also agreed to expand reimbursement to 24-hours per day for skilled nursing care. (SAF 15.) The terms of expanded coverage from 12 to 24 hours and the increased reimbursement rate were incorporated into the agreement by CalPERS, and were reflected in their actions going forward for the past 12 years. (SAF 16.)

There have been significant changed circumstances that warrant a meeting per the 1998 Agreement. (SAF 17.) Other examples of changed circumstances include: it has become much more difficult for Sara to obtain care from skilled nurses and even non-licensed caregivers; Sara's disabilities and associated medical conditions have worsened; Sara's need for care coordination has grown, and; Sara and Jose have had to resort to making out-of-pocket payments to secure both licensed and non-licensed caregivers. (SAF 18.) However, CalPERS has not been, and is not willing to meet with Sara, despite requests to meet with them in-person on several occasions, over the course of many years. (SAF 19.) Moreover, Action Home Nursing stopped performing its duties about nine months into the 1998 Agreement and CalPERS did not replace the services that Action Home Nursing provided with those of another agency. (SAF 20.)

These significant changed circumstances are causing harm to Sara, now, as discussed below. (SAF 21.)

**Sara's Breakdown in Care and Resulting Harm**

As noted, Sara needs a qualified RN or LVN with her 24-hours to address the constant high risk and potentially fatal situations she faces, as well as to ensure that she can receive care in the least restrictive environment possible, her home. (SAF 22.) Sara is at serious risk of anoxia (*i.e.*, brain death), which will occur if she is disconnected from her ventilator (which happens often) for as little

as two minutes (which cannot happen, or Sara may die). (SAF 23.) Sara also needs a skilled nurse trained to prevent other kinds of high risk and potentially fatal situations, such as pressure injuries and other wound-related injuries which have resulted in severe sepsis and other life-threatening infections. (SAF 24.)

Although the care Sara needs is complex, she has received adequate care that allowed her to reside safely at home in the past, and it is possible for her to receive adequate care to allow her to reside safely at home, which is what Sara desires and is the least restrictive environment possible. (SAF 25.)

Sara's past institutionalizations could have been avoided had appropriate and consistent health care been provided to Sara at home. (SAF 26.) Sara was hospitalized at least 11 times beginning in 2014. (SAF 27.) These hospitalizations have fallen into two major categories: (1) inadequate wound care or other infections like urinary tract infections resulting in recurring sepsis (for example, Sara's 2014 and 2017 hospitalizations); (2) falling, being dropped and other medical errors (for example, Sara's 2015 hospitalization). (SAF 28.) These hospitalizations were preventable. (SAF 29.)

Sara wants to avoid being re-institutionalized not only because it is not the least restrictive setting, but also because prior experiences have been traumatizing. (SAF 30.) If re-institutionalized, Sara would lose her entire life that she has built for herself. (SAF 31.) She simply couldn't be herself if she was separated from her community. (SAF 32.) On top of that, Sara risks suffering adverse events or death if forced to go back to an institutional setting. (SAF 33.) For example, it is Sara's experience that hospital-based Intensive Care Unit ("ICU") nurses are not familiar with the acute care that Sara's disability requires (Sara has been admitted to the ICU each re-institutionalization she has experienced, due to her ventilator dependency). (SAF 34.) Sara has experienced an ICU nurse accidentally disconnecting her ventilator and then six ICU staff being unsure how to reconnect the ventilator—Sara had to tell the staff what to do while being manually ventilated well enough to speak (Sara ordinarily cannot talk when her ventilator is disconnected). (SAF 35.) This is not to mention other serious concerns that accompany ICU stays, such as acquiring deadly infections or secondary conditions. (SAF 36.) Additionally, Sara has had horrific experiences while in a sub-acute facility that she never wants to relive, including several ventilator malfunctions (during one of which Sara

**PLAINTIFFS' OPPOSITION TO CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM'S MOTION FOR SUMMARY JUDGMENT**

watched herself turn blue without being able to breathe, until she lost consciousness), catheter problems and failures to manage Sara's leg bag that resulted in an episode of Autonomic Dysreflexia, failures to clean Sara adequately that required evaluation for the presence of vaginal fistula, and multi-drug resistant bacterial infections. (SAF 37.)

Sara is at serious risk of institutionalization because she is unable to obtain skilled nursing care, given that CalPERS has not meaningfully amended the 1998 Agreement beyond the 2012 Boynton Letter. (SAF 38.) The rates that CalPERS pays for skilled nurses are insufficient to attract and retain skilled nursing providers to provide care to Sara. (SAF 39.) Sara often has potential caregivers decline to work with Sara after learning of the rates, and there is very high turnover due to the low CalPERS rates. (SAF 40.) The CalPERS rates only continue to fall more and more behind market rates. (SAF 41.) And Sara has no skilled nurses now. (SAF 42.)

Moreover, CalPERS has not replaced the role Action Home Nursing played in the 1998 Agreement, resulting in a lack of care coordination. (SAF 43.) For a time, Sara used a nurse staffing agency called Nurse Registry to fill Action Home Nursing's role, but the rates Nurse Registry charged were much higher than the CalPERS rates ($90-120 for an LVN and $130-170 for an RN), and CalPERS did not offset Nurse Registry's rates. (SAF 44.) The lack of care coordination is especially difficult for Sara because she is managing 100% of her healthcare, minute by minute, hour by hour, and day by day, which takes a tremendous amount of time and effort, particularly in light of her worsening condition. (SAF 45.) Sara is also often forced to change her own life to accommodate her caregivers' schedules, which causes Sara to miss medical appointments, professional meetings, and social plans. (SAF 46.) Additionally, caregivers often cancel last minute or show up without notice, creating an urgent situation where Sara must find a substitute (though, as noted, now Sara has no caregiver or substitute). (SAF 47.)

Over time, Sara experienced increasingly greater difficulty in securing care from *any* skilled nursing providers, let alone skilled nursing providers who have the experience and qualifications necessary to meet her specific needs (though, as noted, now Sara has no caregiver). (SAF 48.) Sara's care requires experience and expertise that not every RN or LVN possesses or wishes to develop. (SAF 49.) Sara and Jose have been in the situation where payments in addition to the CalPERS rates

**PLAINTIFFS' OPPOSITION TO CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM'S MOTION FOR SUMMARY JUDGMENT**

must be paid out-of-pocket to secure skilled nursing providers. (SAF 50.) Sara is also left in the situation where she has to rely on non-licensed caregivers, which is not the level of care she needs, and pay them out-of-pocket because CalPERS does not reimburse the cost of care by non-licensed providers. (SAF 51.) When Sara cannot hire skilled nurses at the CalPERS rate, the funds that CalPERS set aside for that nursing care are not used, and accumulate. (SAF 52.) This is especially frustrating for Sara because she cannot use any CalPERS funds to cover care for non-licensed caregivers, even where there are "unspent" CalPERS funds. (SAF 53.) Sara has asked CalPERS whether she could access those funds and was denied. (SAF 54.) In the past, Sara has relied on her mother when she could not find a caregiver, but that is no longer an option because Sara's mother is currently injured, and is aging. (SAF 55.)

Sara is experiencing tremendous fear and stress about not having the skilled nursing care she needs, the lack of care coordination, and about having to go back into an institutional setting. (SAF 56.) Sara is terrified about losing her entire life and identity by being re-institutionalized. (SAF 57.) She cannot eat, she cannot sleep, and she has never experienced more stress. (SAF 58.) Sara has attempted to work with CalPERS to amend the 1998 Agreement as amended by the Boynton Letter in an effort to prevent an emergency where Sara has *no* care *at all*. (SAF 59.) Those efforts have failed, and the worst case scenario has resulted where Sara has no care. (SAF 60.) There is an urgent need for emergency relief *now* to prevent Sara from facing re-institutionalization, medical complications, or death. (SAF 61.)

**Allegations in Plaintiff's Complaint**

Sara and Jose have alleged a cause of action against CalPERS in which they seek monetary damages for its violations of Title II of the Americans with Disabilities Act, as well as the applicable administrative regulations that enforce the ADA—and prohibit retaliation against those who attempt to have the ADA enforced. ECF 1 at pp. 7–8. To support this claim, Plaintiffs' complaint summaries the events that led to her current condition. *Id.* at 4–6. It also detailed the written agreements between Plaintiffs and CalPERS, as well as their course of dealing since 1998. *Id.* Based on these facts, Plaintiffs alleged that CalPERS has improperly excluded Sara from its "programs, services, or activities" as a result of its refusal to make the modifications discussed above. *Id.* at 7. Plaintiffs'

**PLAINTIFFS' OPPOSITION TO CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM'S MOTION FOR SUMMARY JUDGMENT**

complaint states that their belief that CalPERS refused to modify its nursing- reimbursement rates in retaliation against them for requesting an increase in those rates. *Id.* at 8 ¶¶ 40, 41. Plaintiffs also requested a declaration that CalPERS's conduct violated Title II, injunctive relief ordering CalPERS to (a) modify its policies, practices, and procedures to allow Sara to reside in her home in the least restrictive environment; and (b) refrain from harassing or discouraging Jose on account of his advocacy for Sara. *Id.* at 9. Finally, Plaintiffs requested attorneys' fees and costs as permitted under the ADA. *Id.*

**Procedural History**

CalPERS filed a motion for a judgment on the pleadings in which it argued, "Title II does not cover disputes over employment benefits," and asked this Court to dismiss Plaintiffs' suit for failing to state a claim on which relief could be granted. ECF 11 at pp. 2, 7–10. In August 2022, Judge England rejected CalPERS's arguments and denied its motion. ECF 23.

In May 2024, Judge England signed a temporary restraining order that requires CalPERS to provide whatever reimbursement rates may be necessary to ensure that Sara receives skilled nursing care 24-hours per day, 7 days per week. ECF 51. Although this order remains in effect, this case is not set for trial, and there is no scheduling order governing discovery. ECF 130. To date, the parties have exchanged written discovery but have not conducted any depositions.

CalPERS filed its pending motion for summary judgment on May 30, 2025. ECF 136. At a conference with the Court on June 9, 2025, the parties expressed their desire for the Court to consider the merits of CalPERS's motion *before* signing a discovery-control order, and the Court agreed. ECF 137; a transcript has not been ordered).

**ARGUMENT & AUTHORITIES**

**A.       Title II applies to Plaintiffs' claims.**

When CalPERS moved for judgment on the pleadings earlier in this proceeding, it argued that the Ninth Circuit's 1999 decision in *Zimmerman v. Oregon Department of Justice* required Plaintiffs to assert their claims about the benefits that CalPERS provides under Title I—as opposed to Title II—of the Americans with Disabilities Act. ECF 11 at pp. 4, 7, 8, 9, 10 (citing 170 F.3d 1169 (9th Cir. 1999)). CalPERS reiterates that argument in its pending motion. ECF 163, at pp. 9, 14, 16, 17. This Court has already rejected this argument and, for the same reasons—as well as those stated below—should do so again. (ECF 23, *Granda v. California Pub. Employees' Ret. Sys.*, 620 F. Supp. 3d 1038, 1043 (E.D. Cal. 2022)).

Although CalPERS claims that this Court's previous opinion "failed to identify any statutory text, caselaw, legislative history, or reason" for its conclusion that Plaintiffs have asserted a viable claim against it under Title II (ECF 136 at p. 19), CalPERS is wrong on all counts. With regard to statutory text, it is important to note from the outset that CalPERS's motion does not even include the language of Title II, which provides:

> No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the **services, programs, or activities** of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132 (emphasis added). With respect to case law, the parties do not dispute that, in *Zimmerman*, the Ninth Circuit held that a public entity's "services, programs, or activities" refer to its "outputs." 170 F.3d at 1174. And in its summary-judgment motion, CalPERS admits that:

— it is a public agency (ECF 136 at p. 27);

— it has a statutory obligation to approve health-benefit plans for the State of California (Id. at p. 10 (citing Cal. Gov. Code § 22793));

— its chief health director refers to these plans collectively as CalPERS's "health benefits program" (Id. at p. 11, 136-15 at pp. 2, 4);

— CalPERS offers a range of health-benefit programs, one of which was called "PersCARE" and is now called "PERS Platinum" (ECF 136 at p. 10, 18); and

**PLAINTIFFS' OPPOSITION TO CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM'S MOTION FOR SUMMARY JUDGMENT**

—      any "normal function" of a "government entity" may qualify as a "program" subject to Title II (Id. at p. 16).

Under the language of Title II, the reasoning in *Zimmerman*, and the admissions in CalPERS's motion, its arguments fail on their face.

But according to CalPERS, the benefits that it provides through its programs is not one of its "outputs" because "it is not generally available to the public." *Id.* at p. 18. Instead, CalPERS claims that it "does not provide an 'output' distinct from employment" and that it merely "helps its sister agencies in managing *their* 'employment inputs.'" *Id.* at pp. 21–22 (emphasis added).[1] These assertions, however, are not supported by any evidence, statute, common law, or common sense.[2]

As this Court noted in its previous opinion, CalPERS's interpretation of the "input" and "output" discussion is misplaced:

> The provision of insurance coverage is unquestionably something that CalPERS "does." As such, it is an "output" of CalPERS as a public agency and therefore Plaintiffs can state a claim under Title II against CalPERS for discrimination due to disability. This is particularly true given…that remedial legislation like the ADA should be construed "broadly in order to effectively implement the ADA's fundamental purpose of providing a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.

ECF 23 at p. 8; *Granda*, 620 F. Supp. 3d at 1044. And although CalPERS now claims that *Currie v. Group Insurance Commission*—a 2001 decision from a federal district court in Massachusetts— "demonstrates *Zimmerman*'s application to administrators of health-care benefits," CalPERS's

---

[1] CalPERS's citation to the California Supreme Court's 2016 decision in *McLean v. State of California*, which addresses the question of "indirect employers" for claims brought under the California Labor Cade—but does not address Title I *or* Title II of the Americans with Disabilities Act—is irrelevant to this discussion. ECF 136 at p. 21 (citing 377 P.3d 796 (Cal. 2016)).

[2] CalPERS's reliance on the following passage from *Zimmerman* actually undermines its arguments:

> Consider how a member of the public would answer the question, "What are the services, programs, and activities of the Parks Department in which you want to participate, or whose benefits you seek to receive." The individual might answer, "I want to participate in the Wednesday night basketball league, or find out about free children's programs for summer months." The individual would not logically answer, "I want to go work for the Parks Department."

ECF 136, at p. 17 (citing 170 F.3d at 1174). CalPERS is apparently suggesting that if "members of the public" were asked about CalPERS's "services, programs, and activities" in which they "want to participate," or the "benefits they seek to receive" from CalPERS, they would respond, "CalPERS does not provide any services, programs, or benefits; it merely helps its sister agencies in managing *their* 'employment inputs.'" Plaintiffs respectfully disagree.

**PLAINTIFFS' OPPOSITION TO CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM'S MOTION FOR SUMMARY JUDGMENT**

description of that court's conclusion is misleading. ECF 136 at pp. 19–20 (citing 147 F. Supp. 2d 30 (D. Mass. 2001)).

Instead, *Currie* only offers an additional explanation as to why ADA claims *by employees* for benefits that *affect their ability to work* (a scenario that cannot be analogized to either Plaintiff in *this* case) are properly brought under Title I instead of Title II. The *Currie* court made this determination after concluding that Congress's decision to separate discrimination claims into in three *separate* titles—employment in Title I, public services in Title II, and public accommodations in Title III— indicated its intent for their remedies to be mutually exclusive.[3] 147 F.Supp.2d 30, 36 (citing *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675, 691 (2001)). But in Currie, as in *all* of the cases that CalPERS has cited to this Court in its previous and current motions,[4] the plaintiff was a state

---

[3] CalPERS's motion fails to inform this Court that the First Circuit later rejected the district court's analysis and declined to decide whether employment benefits can be covered by Title II:

> The district court believed that the clear language of Title I indicated that Title I was the sole avenue for bringing employment claims, and that the clear language of Title II indicated that Title II was limited to so-called "outputs" of a public agency. …The answer is not so plain. While Title I's language clearly covers employment discrimination, and public employers are not exempted from the definition of a covered entity, Title I says nothing about it being an exclusive remedy or avenue for suit. 42 U.S.C. § 12112. It is not unheard of for individuals to have overlapping rights, even within one Act. Here, the two Titles grant substantively different rights—for instance, while Title I gives successful plaintiffs the opportunity to obtain compensatory and punitive damages, there is no such right under Title II. *Id.* § 12133 (referencing 29 U.S.C. § 794a). Nor is the language of Title II clear on this question. The words "public services, programs, or activities" do not necessarily exclude employment,[4] and the "subjected to discrimination" clause may broaden the scope of coverage further. Moreover, the Department of Justice has promulgated a regulation stating that Title II does cover employment practices. 28 C.F.R. § 35.140 (2001); *see also* 28 C.F.R. pt. 35, App. A (2001) (elaborating on § 35.140). …In addition, Currie cites to legislative history which she says demonstrates that Congress intended Title II to cover employment and to function in the same manner as Section 504 of the Rehabilitation Act.

*Currie v. Group Ins. Comm'n*, 290 F.3d 1, 6–7 (1st Cir. 2002). Although the Ninth Circuit has not adopted the First Circuit's reasoning in *Currie*, CalPERS's request for this Court to adopt a factually distinguishable, out-of-state, federal district court decision whose reasoning was rejected by its own controlling tribunal, is particularly unpersuasive.

[4] *See* ECF 23, at p. 7–8; *Granda*, 620 F. Supp. 3d at 1043–44 ("Every case cited by CalPERS for the proposition that *Zimmerman* is controlling involved a plaintiff who was either a current or former employee of the defendant involved, and whose claims arose from actions taken or not taken within the employment context by that employer. *See, e.g.*, *Ahmed v. Regents of Univ. of California*, No. 3:17-cv-00709, 2018 WL 747796 at *12 (S.D. Cal. Feb. 7, 2018) (plaintiff, an employee of the University of California, was denied leave to assert a Title II claim on grounds that any such amendment would be futile under *Zimmerman*); *Kitchen v. Lodi Unified Sch. Dist.*, No. 2:14-cv-01436, 2014 WL 5817320 at * 3-4 (E.D. Cal. Nov. 5, 2014) ("plaintiff's claims arise from her employment with defendant"); *Allford v. Barton*, No. 1:14-cv-00024, 2015 WL 2455138 at *7 (E.D. Cal. May 22, 2015) (because the plaintiff's claims arose from a prior employment relationship with the defendant, he could not assert a claim under Title II)." CalPERS reply brief in support of its motion for judgment on the pleadings—as well as its present motion—also cite *Ritcher v. Ausmus*, No. 3:19-cv-1800, 2021 WL 580055,

---

**PLAINTIFFS' OPPOSITION TO CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM'S MOTION FOR SUMMARY JUDGMENT**

employee complaining about the denial of benefits that she sought to obtain for *herself*. *Id*. at 32. Moreover, the plaintiff in *Currie* did *not* dispute that she *could* have filed suit against her employer under Title I—but chose not to do so. *Id.*at 34 n.6.

But that is not—and cannot be—the case here. Accordingly, this Court should (again) reject CalPERS's efforts to convince this Court that Plaintiffs should have sought relief under Title I, because such relief is plainly unavailable to them.

Title I prohibits discrimination against "qualified individuals" on the basis of disability "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112. And to be a "qualified individual" under Title I, the plaintiff must be "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* at § 12111. But notwithstanding the Supreme Court's determination more than a quarter-century ago that "unjustified institutionalization" constitutes prohibited discrimination under *Title II* of the ADA, *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 597 (1999), **neither Sara nor Jose could *ever* allege an *Olmstead* violation under Title I because neither is complaining that CalPERS's denial of benefits prevent *either* of them from performing essential functions of their jobs**.

Accordingly, to the extent CalPERS still seeks a "reason that direct employers who pay for health benefits are free from Title II liability while the public agency that administers those benefits remains liable," (ECF 136 at p. 19), this facts of this case allow this Court to provide a simple answer: Direct employers who pay for health benefits *may* be free from Title II liability because they are *not* free from Title *I* liability. And because the Ninth Circuit has held that "the public agency that administers benefits" *cannot* be liable under Title I, *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104 (9th Cir. 2000), there is no *conceivable* public-policy reason to create a special immunity for *these particular agencies*—the ones who are uniquely charged with facilitating access to the very medical care on which disabled people *depend*—from the same forms of disability discrimination

---

*8-9 (N.D. Cal., Feb. 16, 2021) (plaintiff was a former employee of the Oakland Police Department). ECF 15 at p. 4; ECF 136 at p. 17). CalPERS again cites *Kitchen* twice in its present motion. ECF 136 at pp. 9, 18).

-10-

**PLAINTIFFS' OPPOSITION TO CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM'S MOTION FOR SUMMARY JUDGMENT**

that the Americans with Disabilities Act was enacted to discourage. Indeed, such a result produces the type of absurdity that courts are routinely cautioned to avoid. *See, e.g.*, *United States v. Wilson*, 503 U.S. 329, 334 (1992).

In sum, under CalPERS's proposed interpretation of Title II, if it unlawfully discriminates against the non-employee family members who are covered by its benefits programs (i.e., its "outputs"), these victims have no legal remedy under the Americans with Disabilities Act whatsoever. In light of this Court's previous acknowledgment that "remedial legislation like the ADA should be construed broadly in order to effectively implement its fundamental purpose of providing a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" (ECF 23 at p. 8; *Granda*, 620 F. Supp. 3d at 1044)—and in the absence of any controlling authority to suggest that it should not—this Court should reject CalPERS's arguments that Plaintiffs' claims are not covered by Title II, again.

**B.**      **The ADA's "safe-harbor provision" does *not* apply to Plaintiffs' claims.**

CalPERS's argument that the ADA's "safe-harbor provision" bars Plaintiffs' claims is also misdirected. According to CalPERS, Plaintiffs are alleging that "PERS Platinum is discriminatory, and violates Title II, because it does not offer the in-home nursing coverage that Sara seeks" and are suing CalPERS "for establishing, sponsoring, observing, or administering the terms of PERS Platinum." ECF 136 at pp. 24–25. Conspicuously absent from the five pages of argument in section V of CalPERS's motion, however, is *any* citation to *any* of the allegations that Plaintiffs *actually* alleged in their complaint. (In fact, none of the words that CalPERS used when "summarizing" Plaintiffs' allegations even *appear* in their complaint.)

Contrary to CalPERS's representation, Plaintiffs are *not* complaining about "the terms of PERS Platinum" for California's state employees *as a whole*. Instead, Plaintiffs have alleged that CalPERS violated Title II through its discriminatory performance of a *separate* agreement that CalPERS made with Plaintiffs with regard to the allocation of funds in *their particular* PERS Platinum program. *See supra*, pp. 2–7 & Exs. 1–3; ECF 1 at pp. 5–8. But rather than acknowledge the peculiarity of the issue presented, CalPERS asks this Court to apply the holdings in three cases that support its straw-man argument.

-11-

CalPERS first directs this Court to the Ninth Circuit's above-referenced decision in *Weyer*. ECF 136 at pp. 23–25 (citing 198 F.3d at 1104). There, the court addressed (a) the potential for Title *I* and Title *III* claims against (a) an insured's *former* employer; and (b) the employer's long-term-disability benefits administrator. 198 F.3d at 1108. Of course, this is a Title II case, and neither Plaintiff is a former employee.[5] But even if *Weyer* did address claims under Title II by currently covered family members of current employees, the excerpts that address the ADA's "safe-harbor" provision are not essential to the holding and are, therefore, nothing more than dicta. ECF 136 at p. 24 (citing 198 F.3d at 1115).[6]

But because the Ninth Circuit's opinion in *Weyer* cited the Fourth Circuit's 1999 decision in *Rogers v. Department of Health and Environmental Control* in its dicta discussion, CalPERS claims that its holding applies here. ECF 136 at p. 23, 26 (citing 174 F.3d 431 (4th Cir. 1999)). In *Rogers*, the court held that Title II does not require a state's long-term disability plan to provide equal benefits for mental and physical disabilities. 174 F.3d at 435. Plaintiffs do not quarrel with the court's analysis—because it is irrelevant to their claims against CalPERS.

Here—unlike the plaintiff in *Rogers*—Plaintiffs are not alleging that CalPERS violated Title II because it does not provide "parity of coverage" between different types of benefits or that it "engaged in discriminatory risk classification that lacked actuarial justification." 174 F.3d at 436–37. Again, Plaintiffs are alleging that CalPERS violated Title II in its discriminatory performance of a *separate* agreement that CalPERS made with Plaintiffs with regard to the allocation of funds in *their particular* PERS Platinum program. *See supra*, pp. 2–7 & Exs. 1–3; ECF 1 at pp. 5–8. Nothing in *Rogers* addresses a similar scenario.

In a third effort to buttress its "safe-harbor" argument, CalPERS again relies on the

---

[5] CalPERS's reliance on *Weyer* is self-defeating, as it provides controlling authority for *Plaintiffs'* arguments that a "totally disabled plaintiff" could *never* meet the definition of a "qualified person" under Title I, and that a benefits administrator could *never* meet the definition of a "covered entity" under Title I. 198 F.3d at 1108–09, 1113). which further undermines CalPERS's arguments that Plaintiffs sole remedy lies under that section of the ADA.

[6] "Dicta" is defined as "those portions of an opinion that are 'not necessary to deciding the case then before us." *See, e.g.*, *Stein v. Kaiser Found. Health Plan, Inc.*, 115 F.4th 1244, 1250 (9th Cir. 2024). When analyzing the plaintiff's Title III claims against the benefits administrator, the Ninth Circuit first concluded that they were not viable because "an insurance company administering an employer-provided disability policy is not a "place of public accommodation." *Weyer*, 198 F.3d at 1115. The court could have ended its analysis there.

-12-

**PLAINTIFFS' OPPOSITION TO CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM'S MOTION FOR SUMMARY JUDGMENT**

Massachusetts district court's above-cited opinion in *Currie.* ECF 135 at pp. 24–25 (citing 147 F. Supp. 2d at 37). And again, CalPERS fails to acknowledge that the First Circuit refused to adopt the district court's analysis of the "safe-harbor" issue. *Currie*, 290 F.3d at 8–9. The First Circuit's opinion in *Currie* also rejected the state's benefits administrator's request for the court to reject the plaintiffs' arguments regarding the *in*applicability of the ADA's "safe-harbor" provision. *Id.* So even if Plaintiffs' allegations *did* implicate this provision, *Currie* does not support CalPERS's motion for summary judgment. And because Plaintiffs' allegations are *not* vitiated by the ADA's "safe-harbor provision," Plaintiffs have no obligation to prove an exception to it.

And even if Plaintiffs *did* have to prove that CalPERS was using the "safe-harbor provision" as a "subterfuge to evade the purposes of the act," 42 U.S.C. § 12201(c), genuine issues of material fact remain in dispute with regard to CalPERS's intentions with respect to its course of dealings with Plaintiffs that preclude summary judgment. Tellingly, CalPERS's motion does not cite to any evidence in support of its conclusory assertion that "PERS Platinum is not a subterfuge." ECF 136 at p. 26. Such unsupported allegations do not shift the burden to Plaintiffs to come forward with evidence, nor can they support a summary judgment. *See, e.g.*, *Walker v. Sumner*, 917 F.2d 382, 387 (9th Cir. 1990).

Finally, should this Court conclude that CalPERS *has* shifted the burden to Plaintiffs to come forward with evidence to show a factual dispute as to whether it was using "safe-harbor provision" as a "subterfuge"—or if it is willing to consider evidence referenced elsewhere in CalPERS's motion that could potentially support CalPERS's "not-a-subterfuge" assertion—Plaintiffs respectfully submit that they are entitled to relief under Federal Rule of Civil Procedure 56(k) because they cannot present facts essential to support this argument in this opposition brief.[7] Proof of subterfuge requires a showing of discriminatory intent; not merely a "lack of actuarial justification." *Rouse v. Berry*, 848 F. Supp. 2d 4, 8 (D.D.C. 2012). And as this Court is aware from its conversation with counsel at a hearing on June 9, 2025 (ECF 137), the parties have agreed that depositions have not yet occurred and should not commence until after the Court determines this motion. But in the absence of an opportunity to pursue additional discovery from CalPERS's undisclosed and undeposed

---

[7] A supporting declaration from Plaintiffs' counsel is included on the final page of this opposition.

**PLAINTIFFS' OPPOSITION TO CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM'S MOTION FOR SUMMARY JUDGMENT**

witnesses who purport to provide (a) facts about the specific properties of its benefits programs (such as the source of their funds, the amount and direction of their expenditures, and the scope of their coverage); and (b) opinions about CalPERS's compliance with "established insurance principles" (ECF 136-1, 136-2, 136-15), Plaintiffs cannot be reasonably expected to come forward with evidence of CalPERS's "intentions." Accordingly, should this Court conclude that it is necessary to reach this issue, Plaintiffs respectfully request this Court to deny CalPERS motion, defer its consideration after permitting additional time for discovery, or issue any other appropriate order that protects Plaintiffs' rights to present a substantive opposition to this ground for summary judgment.

**C.    Plaintiffs' claims for monetary damages against CalPERS are not barred by the Eleventh Amendment.**

At the outset of this discussion, it is essential to note that CalPERS's motion concedes that Congress fully intended to abrogate its Eleventh Amendment immunity when it enacted Title II. 42 U.S.C. § 12202. And Plaintiffs do not dispute that, before they can recover monetary damages for CalPERS's discriminatory acts, they must explain:

(1) which aspects of CalPERS's misconduct violated Title II;

(2) the extent to which CalPERS's misconduct also violated the Fourteenth Amendment; and

(3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid.

ECF 136 at p. 28 (citing *Kohn v. State Bar of Cal.*, 119 F.4th 693, 698 (9th Cir. 2024)). But CalPERS's assertion that the Eleventh Amendment continues to provide it with immunity from Plaintiffs' claims for damages because (a) "Sara does not have a Fourteenth Amendment right to unlimited, in-home medical care" and (b) "there is no Congressional record demonstrating Congressional intent to regulate the public administration of health-care insurance," ECF 136 at p. 29, misstates the applicable law and the level of generality through which courts have addressed this same question for decades.

**PLAINTIFFS' OPPOSITION TO CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM'S MOTION FOR SUMMARY JUDGMENT**

**1.  There is a genuine issue of material fact as to whether CalPERS violated Title II.**

With respect to the first element, the attached evidence is sufficient to demonstrate a genuine issue of material fact as to whether Sara "was excluded from participation in or discriminated against with regard to CalPERS's services, programs, or activities."[8] As discussed at length in the opening section of this opposition, declarations already on file with the Court reveal (among other things):

— In 2012, CalPERS agreed to modify its benefits program for Sara to reimburse her for the cost of in-home skilled nursing care, 24 hours per day, 7 days per week;

— CalPERS's refusal to increase its reimbursements to the market rate has required Plaintiffs to pay for Sara's care out-of-pocket;

— When Sara does not have skilled nursing care, she has suffered serious physical injuries and mental anguish;

— In the absence of this care, Sara will have to be institutionalized.

*See supra*, pp. 2–7 & Exs. 1–3. This section of CalPERS motion again ignores the Supreme Court's *Olmstead* decision, in which it held that evidence of unjustified institutionalization—even if facially neutral—is sufficient to demonstrate a Title II violation. 527 U.S. at 597. And although *Olmstead* acknowledged that courts may also consider "the resources of the state and the needs of others with [similar] disabilities" when determining whether a violation has occurred, *Id.* at 607, CalPERS's motion does not include any evidence on this issue. This Court, therefore, cannot conclude that CalPERS is entitled to a summary judgment on this basis.

**2.  Plaintiffs have alleged valid Fourteenth Amendment violations against CalPERS.**

CalPERS's assertion that the Plaintiffs' claims are barred by the Eleventh Amendment reflects its misunderstanding of a recent Ninth Circuit decision and fails to identify the issue that is *actually* before this Court. Although it correctly notes that, in *Kohn*, the Ninth Circuit revealed that it (a) no longer considers *all* Title II violations to be Fourteenth Amendment violations and, therefore,

---

[8] As CalPERS stated in its motion, "To establish a violation of Title II of the ADA, a plaintiff must show that (1) she is a qualified individual with a disability; (2) she was excluded from participation in or otherwise discriminated against with regard to a public entity's services, programs, or activities, and (3) such exclusion or discrimination was by reason of her disability." ECF 136 at pp. 16–17 (citing *Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002)). But CalPERS also stated, "This motion addresses only the second element." *Id.* at 17.

**PLAINTIFFS' OPPOSITION TO CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM'S MOTION FOR SUMMARY JUDGMENT**

(b) requires district courts to "provide reasoning supporting their conclusion that Congress did not prophylactically abrogate sovereign immunity" with respect to the plaintiff's claims, (ECF 136 at 28–29 (citing 119 F.4th at 699)), this requirement is not nearly as impossible as CalPERS appears to suggest.

As a preliminary matter, however, this Court should conclude that a "prophylactical-abrogation analysis" is not necessary if it construes Plaintiffs' claims to allege a violation of a "fundamental" right. In *United States v. Georgia*, the Supreme Court addressed a state's effort to assert Eleventh Amendment immunity in response to a plaintiff's allegation that it violated Title II of the ADA. 546 U.S. 151, 157 (2006). When doing so, it clarified that the Eleventh Amendment does *not* bar actions under the ADA that are based on "conduct that independently violates the provisions of section 1 of the Fourteenth Amendment." *Id*. As this Court is certainly well-aware, this section prevents states from "depriving any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

Accordingly, when an ADA plaintiff alleges conduct that concurrently violates both section 1 of the Fourteenth Amendment *and* the ADA, the claim may proceed regardless of whether the relevant statutory provision validly "enforces" the Fourteenth Amendment in other contexts. *Georgia*, 546 U.S. at 157; *see also Tennessee v. Lane*, 541 U.S. 509, 524 (2004). And although the Supreme Court reiterated in *Board of Trustees of University of Alabama v. Garrett* that "states are not required by the Fourteenth Amendment to make special accommodations for the disabled, *so long as their actions toward such individuals are rational*," 531 U.S. 356, 367 (2001), Plaintiffs respectfully submit that their evidence, which shows that it was aware of Sara's perilous condition and medical needs necessary to avoid institutionalization, yet:

— refused to meet with Sara for many years to discuss adjustments to her nurse's reimbursement rates (SAF 19);

— did not replace the role that Action Home Nursing played in its 1998 Agreement with Plaintiffs, despite its awareness that it was no longer in business; (SAF 43);

— refused to offset the rates of other staffing providers (SAF 44); and

-16-

**PLAINTIFFS' OPPOSITION TO CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM'S MOTION FOR SUMMARY JUDGMENT**

— refused to permit Sara to use unspent funds to cover care for non-licensed caregivers (SAF 53, 54).

And because CalPERS has not argued—nor offered any evidence to suggest that its actions towards Sara *were* rational, summary judgment is inappropriate on this issue.

Should this Court conclude that the evidentiary record cannot support Plaintiffs' claims that CalPERS violated a right protected by section *1* of the Fourteenth Amendment, it must next determine whether Plaintiffs have shown that CalPERS violated a right protected by section *5*. The elements of the "prophylactic-abrogation test" that courts use to make this determination are well established; they merely require a court to consider:

(1) the constitutional right or rights that Congress sought to protect when it enacted the statute;

 (2) whether there was a history of constitutional violations to support Congress's determination that prophylactic legislation was necessary; and

(3) whether the statute is a congruent and proportional response to the history and pattern of constitutional violations.

*City of Boerne v. Flores*, 521 U.S. 507, 520 (1997). This Court should conclude that Plaintiffs allegations, and the evidence they have already offered in support, satisfy all three.

### a.  Elements One and Two: Addressing the Evil

This first two elements of this test require this Court to identify "the constitutional wrong or evil at which the ADA was aimed." *Florida Prepaid Postsecondary Educ. Expense Bd. v. College Savings Bank*, 527 U.S. 627, 646 (1999). This inquiry is extensive—but not difficult.[9]

Congress made clear in its extensive legislative findings and record that the ADA was designed to remedy the longstanding, purposeful discrimination against persons with disabilities. Congress's findings include the following:

(2) historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with

---

[9] Large portions Plaintiffs' arguments on this issue are excerpted directly from *Lewis v. New Mexico Dep't of Health*, 94 F. Supp. 2d 1217, 1226–27 (D.N.M. 2000), *aff'd*, 261 F.3d 970 (10th Cir. 2001). Rather than "block quote" the entire discussion, or follow each sentence with a citation to *Lewis*, this opposition only includes the opinion's internal citations, except when referencing a portion that is directly attributable to the *Lewis* court.

**PLAINTIFFS' OPPOSITION TO CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM'S MOTION FOR SUMMARY JUDGMENT**

disabilities continue to be a serious and pervasive social problem;

(3) discrimination against individuals with disabilities persists in such critical areas as ... institutionalization, health services, ... and access to public services; ....

(5) individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of ... barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs activities, benefits, jobs or other opportunities;

(6) census data, national polls, and other studies have documented that people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and educationally;

(7) individuals with disabilities are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals and resulting from stereotypic assumptions.

42 U.S.C. § 12101(a).

Moreover, the legislative record includes references to much intentional discrimination against individuals with disabilities, by both public and private actors. *See* H.R. Rep. 101–485(II), at 29–30 (1989), *reprinted in* 1990 U.S.C.C.A.N. 903, 311–12 (testimony of Judith Heumann recounting being repeatedly excluded: from public school because her wheelchair might be a fire hazard, from living in a college dormitory, from teaching, and from an auction house because she and her disabled friend were "disgusting to look at"); *id.* at 30 (referring to *Alexander v. Choate,* 469 U.S. 287 (1985), as a case example of disability discrimination in which a court ruled that a cerebral palsied child should be excluded from public school because his teacher felt his appearance 'produced a nauseating effect' on his classmates"); *id.* at 40 (testimony regarding town hall and public school's failure to be accessible to people with disabilities); *id.* at 41 (testimony about paralyzed people being excluded from school and jobs and being deemed unfit parents); *id.* at 85 (case of a deaf woman who died because of the police's failure to respond when her husband tried to call 911 using his telecommunication device for the deaf (TDD)); H.R. Rep. 101–485(III), at 50 (1989), *reprinted in* 1990 U.S.C.C.A.N. 445, 473 (persons with epilepsy are frequently wrongly arrested and then denied their medication in jail). In sum, the Congressional record tells a vivid story of people with disabilities being excluded from or mistreated in a range of public services because of prejudice, malice, and ignorance about the needs and abilities of people with disabilities. *Lewis*, 94

-18-

**PLAINTIFFS' OPPOSITION TO CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM'S MOTION FOR SUMMARY JUDGMENT**

F. Supp. 2d at 1226–27.

Accordingly, there can be no legitimate dispute that many of the wrongs that the ADA seeks to remedy *are* constitutional violations. In *Cleburne v. Cleburne Living Center, Inc.*, the Supreme Court held that arbitrary discrimination against persons with disabilities violates the Fourteenth Amendment's Equal Protection Clause. 473 U.S. 432, 446 (1985). And as noted above, the ADA's legislative record includes numerous examples of arbitrary, intentional disability. This Court, therefore should conclude that the ADA is aimed at remedying constitutional wrongs.

### b. Element Three: Proportionality

Next, the Court must assess whether the remedy enacted is proportional to the wrong of pervasive disability discrimination. *Flores*, 521 U.S. at 520. When making this determination, the Court should acknowledge that Congress is owed great deference in determining how best to remedy disability discrimination. *Cleburne*, 473 U.S. at 442–42. As the Supreme Court has stated, "how this large and diversified group is to be treated under the law is a difficult and often a technical matter, very much a task for legislators guided by qualified professions and not by the perhaps ill-informed opinions of the judiciary." *Id.* And the remedy Congress chose that is at issue here —Title II—only requires public entities to provide services to "qualified individuals with a disability," that is, persons who meet the essential eligibility requirements of the program with or without modifications. 42 U.S.C. § 12131(2). In sum, Congress chose to protect persons with disabilities from being excluded because of stereotypes, animus, or overprotective rules, while not requiring public entities to alter their essential eligibility requirement under the ADA. *Lewis*, 94 F. Supp. 2d at 1228–29.

Moreover, Plaintiffs' ADA claims in this case are brought pursuant to the Justice Department's "integration mandate," which requires public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." ECF 1, at pp. 7–8 (citing 28 C.F.R. § 35.130(d)). The "integration mandate" is limited by another regulation providing that a public entity need not modify its programs to prevent discrimination based on disability if such modification would "fundamentally alter" the service or program. *Id.* (citing 28 C.F.R. § 35.130(b)(7)). And given that Congress identified segregation as one of the issues at which the ADA was aimed, these regulations—taken

-19-

together—are certainly not arbitrary, capricious, or contrary to the statute. *Lewis*, 94 F. Supp. 2d at 1229.

For all of these reasons, this Court should conclude that Plaintiffs have (a) met all three elements of the "prophylactic-abrogation test" and (b) offered sufficient evidence to demonstrate that CalPERS is not entitled to summary judgment on its Eleventh Amendment defense to Plaintiffs' Title II claims.

### 3. CalPERS's authorities suggesting an opposite result are not persuasive.

Finally, this Court should reject CalPERS's efforts to compare Plaintiffs' allegations of disability discrimination based on unjustified institutionalization (which are supported by evidence in the record) to cases involving other, less pervasive forms of disability discrimination with weaker evidentiary records.

CalPERS first directs this Court to the Second Circuit's recent decision in *T.W. v. New York State Board of Law Examiner* as an example of a scenario in which a federal court of appeals held that the Eleventh Amendment barred a Title II claim. ECF 136 at 29 (citing 110 F.4th 71, 82 (2d Cir. 2024)). But the court in *T.W.* reached that conclusion when applying the "prophylactic-abrogation test" because it also found that *no* legislative history "documenting a pattern of unconstitutional discrimination in the administration of professional licensure examinations by states, in the granting of professional licenses, or regarding occupational choice more generally." 110 F.4th at 85. Of course, Plaintiffs' allegations in this proceeding have nothing to do with professional licensure and, as discussed above, Plaintiffs' claims are supported by *substantial* legislative history.

CalPERS's reliance on a Georgia federal district court's 2019 decision in *Musgrove v. Board of Regents of the University System of Georgia* is similarly unpersuasive. ECF 136 at pp. 29–30 (citing No. 3:18-cv-80, 2014 WL 13301434, at *5 (M.D. Ga. Feb. 14, 2019)). There, the plaintiff was an employee of a Georgia state entity, and his employer-sponsored health insurance refused to cover breast-reduction surgery and other medically necessary treatments for gender dysphoria. *Id.* at *2. The district court concluded that the Eleventh Amendment barred the plaintiff's claims against his benefits administrator because he did not direct the court to *any* binding authority holding that Congress validly abrogated Eleventh Amendment immunity for Title II claims by state employees

**PLAINTIFFS' OPPOSITION TO CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM'S MOTION FOR SUMMARY JUDGMENT**

related to their employment benefits." *Id.* at *5. The court may have used a broad level of generality when framing the plaintiff's challenge in *Musgrove* because the legislative history of Title II does not suggest that Congress sought to "remedy the evils" of disability discrimination based gender dysphoria. But as discussed at length above, the same thing *cannot* be said with respect to Congress's efforts to "remedy the evils" of disability discrimination based on unjustified institutionalization. Accordingly, *Musgrove* does not support CalPERS's argument that Plaintiffs' alleged Title II violations are insufficiently proportionate to the remedy they request.

* * *

At bottom, CalPERS has failed to carry its burden to prove that—as a matter of law—Plaintiffs claims for monetary damages for its violations of Title II is barred by the Eleventh Amendment. Accordingly, summary judgment is not appropriate on this basis either.

**D.     Because summary judgment is inappropriate on Sara's claims under Title II, CalPERS is not entitled to summary judgment on Jose's claims either.**

Finally, it is clear that CalPERS's motion for summary judgment on *Jose's* claims ultimately turns on its ability to convince this Court that it is entitled to summary judgment on *Sara's* claims. ECF 136 at p. 31. For the reasons discussed in sections III-A through III-C above, CalPERS's has not demonstrated its right to judgment as a matter of law on Sara's claims. Accordingly, CalPERS's is not entitled to judgment as a matter of law on Jose's claims either.

**CONCLUSION**

This Court should deny CalPERS's motion for summary judgment.

Dated: July 11, 2025                              **ARIAS SANGUINETTI WANG & TEAM LLP**

By: */s/ Matthew J. Kita*
         ELISE R. SANGUINETTI
         MATTHEW J. KITA
         Attorneys for Plaintiffs

**PLAINTIFFS' OPPOSITION TO CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM'S MOTION FOR SUMMARY JUDGMENT**

**DECLARATION IN SUPPORT OF RULE 56(k) RELIEF**

My name is Matthew J. Kita. I am counsel of record for Plaintiffs in this proceeding. I declare under penalty of perjury that the factual statements in Plaintiffs request for relief under Federal Ruke of Civil Procedure 56(k) are true and correct.

July 11, 2025                              */s/ Matthew J. Kita*
                                          Matthew J. Kita

-22-
**PLAINTIFFS' OPPOSITION TO CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM'S
MOTION FOR SUMMARY JUDGMENT**

**PROOF OF SERVICE**